UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

ALINE ANGULO-GOMEZ,

　　　　　　　　　Defendant.

**DECISION AND ORDER**

1:19-CR-00061 EAW

---

## INTRODUCTION

On February 7, 2020, United States Magistrate Judge Michael J. Roemer issued a Report and Recommendation (the "R&R") (Dkt. 48) regarding an omnibus motion filed by defendant Aline Angulo-Gomez ("Defendant") on June 10, 2019 (Dkt. 17). Specifically, Judge Roemer recommended that the Court deny Defendant's motion to dismiss the Indictment and motion to suppress. (*Id.* at 1). Defendant filed objections to the R&R. (Dkt. 49). For the following reasons, Defendant's objections are overruled, and the Court adopts the R&R in its entirety.

## BACKGROUND

The relevant facts, which are largely taken from Defendant's objections and which the Court assumes are true for purposes of the pending motions only, are as follows. Defendant is a 37-year-old Mexican citizen who originally came to the United States on a tourist visa which expired in January 2009. (Dkt. 49 at 3). She lives in Elkhart, Indiana with her fiancé Samuel, who she has been with for 11 years, and their two children ages

seven and nine.[1]  (*Id.* at 2).  In the summer of 2014, Defendant returned to Mexico for a medical procedure and to care for her sick mother.  (*Id.* at 3).

On December 31, 2014, Defendant attempted to enter the United States on foot at the Morley Gate Port of Entry in Nogales, Arizona, by presenting a visa with the photo, name, and date of birth of Maria de Los Angeles Jara.  (*Id.*; Dkt. 24 at 2).  Defendant applied for admission, and a Customs and Border Protection ("CBP") official flagged her application and referred her for further inspection.  (Dkt. 49 at 4; Dkt. 24 at 2).  Defendant provided a sworn statement admitting that she had purchased another person's visa to enter the United States and that she lived in the United States illegally from January 2009 until July 2014.  (Dkt. 24 at 8-10, 13).  CBP officials contacted the U.S. Attorney's Office in their district regarding Defendant's possible violation of 18 U.S.C. § 1028, and the U.S. Attorney's Office declined to prosecute.  (*Id.*).  CBP Officer Christopher Dominguez completed a Discretionary Authority Checklist for Alien Applicants form (hereinafter "Checklist") regarding Defendant and determined that Defendant should not be permitted to withdraw her application for admission.  (Dkt. 19 at 16-18).  The Checklist was reviewed and approved by the supervisory CBP officer and the chief CBP officer.  (*Id.*).

Subsequently, the Department of Homeland Security ("DHS") determined that Defendant was inadmissible under §§ 212(6)(C)(i) and 212(7)(A)(i)(1) of the Immigration and Nationality Act ("INA").  (Dkt. 24 at 15-16).  As a result, Defendant was informed that

---

[1]     Samuel is presently applying for lawful permanent resident status, and the two children are citizens of the United States.  (Dkt. 49 at 2).

she was prohibited from entering the United States for a period of five years without permission from the Attorney General or the Secretary of Homeland Security. (*Id.* at 18).

Four years later, on December 18, 2018, Defendant was a passenger on an Amtrak train that had stopped at the Amtrak station in Depew, New York. (Dkt. 49 at 6). United States Border Patrol ("BP") Agent Jason Rouch, along with two other border patrol agents, boarded the train to conduct transportation checks. (*Id.*). Agent Rouch was in his standard uniform, which includes a hat, badge, BP patch, bulletproof vest, handcuffs, holster, gun, and collapsible baton. (*Id.* at 7). He walked to the front of the dining car to let passengers know that a law enforcement officer was onboard, and then began approaching passengers and conducting transportation checks. (*Id.*). There were about 10 people in the dining car, and Agent Rouch asked each passenger his or her citizenship, and depending on the answer, he would ask to see a passport. (*Id.*).

After questioning four or five passengers, Agent Rouch approached Defendant. (*Id.*). Defendant was seated in a window seat at a table in the middle of the dining car, and Agent Rouch stood in the middle aisle while he questioned her. (*Id.* at 8). Agent Rouch identified himself as a BP agent and asked Defendant's citizenship. (*Id.*). She replied that she was a citizen of Mexico, and he then asked for her passport, which Defendant handed to him. (*Id.*). Agent Rouch reviewed the passport for a visa but did not find one and asked Defendant if she had a visa. (*Id.*). Defendant told Agent Rouch she did not, and he then asked if she was present in the United States illegally, and she admitted she was. (*Id.*; Dkt. 52 at 7). Agent Rouch then asked Defendant if she had any personal property, and she confirmed she did. (Dkt. 52 at 7). She then led Agent Rouch to the passenger compartment

where her belongings were and collected them, and they exited the train.  (*Id.*).  Agent Rouch arrested Defendant and brought her to the BP Station.  (*Id.*).

On December 21, 2018, a criminal complaint was filed against Defendant charging a violation of 8 U.S.C. § 1326(a).  (Dkt. 1).  A detention hearing was held on January 7, 2019, before Judge Roemer, who determined Defendant should be released on conditions. (Dkt. 4; Dkt. 6).  On April 2, 2019, a grand jury returned an Indictment against Defendant charging one count of being a removed alien found in the United States in violation of 8 U.S.C. § 1326(a).  (Dkt. 10).  All pretrial matters were referred to Judge Roemer pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B).  (Dkt. 12).  Defendant was arraigned before Judge Roemer on April 9, 2019, and she entered a plea of not guilty.  (Dkt. 14).

On June 10, 2019, Defendant filed an omnibus motion that included a motion to dismiss the Indictment and motion to suppress evidence.  (Dkt. 17).  Judge Roemer conducted a suppression hearing on August 15, 2019, at which time the Government presented the testimony of Agent Rouch and entered into evidence exhibit 1.  (Dkt. 36; Dkt. 37).  Defendant did not present any testimony at the hearing, but she entered into evidence exhibits B through L.   (Dkt. 36; Dkt. 37).   The parties filed post-hearing memoranda on November 22, 2019.  (Dkt. 42 (Defendant's Memorandum); Dkt. 43 (Government's Memorandum)).  Defendant filed her reply on November 30, 2019 (Dkt. 44), and the Government filed its reply on December 15, 2019 (Dkt. 45).  A post-hearing oral argument was held before Judge Roemer on January 3, 2020 (Dkt. 46), and further oral argument regarding the motion to dismiss the Indictment and other outstanding issues was held on January 15, 2020 (Dkt. 47).

- 4 -

On February 7, 2020, Judge Roemer issued the R&R that, among other things, recommended denying Defendant's motion to dismiss and motion to suppress.  (Dkt. 48). Defendant filed objections on February 7, 2020 (Dkt. 49), to which the Government responded on March 12, 2020 (Dkt. 52).  Oral argument was originally scheduled before the undersigned on March 26, 2020 (Dkt. 50), but was adjourned at Defendant's request in light of the ongoing COVID-19 pandemic (Dkt. 53; Dkt. 54).  On May 27, 2020, oral argument was held by telephone, at which time the Court reserved decision and requested additional information from the parties.  (Dkt. 58).  The information was submitted that same day, at which time the undersigned took the matter under advisement.  (Dkt. 58; Dkt. 59).  However, on June 25, 2020, the United States Supreme Court issued its decision in *Department of Homeland Security v. Thuraissigiam*, 140 S. Ct. 1959 (2020), holding that a petitioner whose asylum claim was denied did not have a constitutional right to habeas review under either the Suspension Clause or the Due Process Clause.  As a result, on June 26, 2020, the Court requested supplemental briefing, clarified that the Speedy Trial Clock remained stopped pursuant to 18 U.S.C. § 3161(h)(1)(D), and granted an interests of justice exclusion pursuant to 18 U.S.C. § 3161(h)(7)(A) through July 31, 2020.  (Dkt. 60). Defendant filed a supplemental memorandum on July 23, 2020 (Dkt. 61), the Government submitted a supplemental memorandum on July 24, 2020 (Dkt. 62), and neither party filed a reply memorandum.

## DISCUSSION

## I.   Legal Standard

A district court reviews any specific objections to a report and recommendation on a dispositive issue, such as a motion to suppress, under a *de novo* standard.  Fed. R. Crim. P. 59(b)(3); *see also* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.").  To trigger the *de novo* review standard, objections to a report and recommendation "must be specific and clearly aimed at particular findings in the magistrate judge's proposal."  *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009).

## II.   Motion to Dismiss the Indictment

As noted in the R&R, to successfully challenge a deportation order that serves as the underlying basis for a charge under 8 U.S.C. § 1326(a),[2] an alien must demonstrate each of the following requirements:

---

[2]      The underlying basis for deportation in the instant matter is Defendant's 2014 expedited order of removal.  While 8 U.S.C. § 1252(e)(2) generally does not allow for review of expedited removal proceedings, the R&R found that there was jurisdiction over the instant matter because of the Supreme Court's decision in *United States v. Mendoza-Lopez*, 481 U.S. 828 (1987), which holds that a criminal defendant has a Fifth Amendment right to "*some* meaningful review" of a prior administrative proceeding that resulted in the exclusion, deportation, or removal order used as a predicate to a § 1326 offense.  *Id.* at 837-38; (*see* Dkt. 48 at 6).  Neither party objected to the R&R's jurisdictional finding, and in their supplemental briefing, neither party believes that the Supreme Court's decision in *Thuraissigiam* impacts the Court's jurisdiction in the instant matter.  (Dkt. 61; Dkt. 62).  The Court agrees with both parties that *Thuraissigiam*'s holding does not impact the jurisdictional finding here because it addresses only asylum seekers seeking direct review of their expedited removal proceedings and does not speak to *Mendoza-Lopez* or

- 6 -

(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;

(2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

(3) the entry of the order was fundamentally unfair.

28 U.S.C. § 1326(d); *see United States v. Gonzalez-Roque*, 301 F.3d 39, 45 (2d Cir. 2002) (discussing that to challenge an order of deportation, a defendant "must satisfy each of the three requirements of 8 U.S.C. § 1326(d)"). The R&R recommends denial of the motion to dismiss on the ground that Defendant failed to satisfy the third requirement: that entry of Defendant's prior removal order was "fundamentally unfair." (Dkt. 48 at 7-13). Defendant argues that a fundamental procedural error occurred with the prior deportation order because Defendant was not granted discretionary relief and allowed to withdraw her application for admission into the United States, so that she could "immediately walk back to Mexico." (Dkt. 49 at 12).

"To show fundamental unfairness, a defendant must show both a fundamental procedural error and prejudice resulting from that error." *United States v. Perez*, 330 F.3d 97, 104 (2d Cir. 2003) (quotation omitted). "[T]o demonstrate prejudice an alien must show that his proceeding contained errors so fundamental that he might have been deported in error." *United States v. Fernandez-Antonia*, 278 F.3d 150, 159 (2d Cir. 2002); *see United States v. Daley*, 702 F.3d 96, 100 (2d Cir. 2012) ("The alien bears the burden of showing that entry of the removal order was fundamentally unfair."). The Court agrees

---

defendants facing criminal charges who are collaterally attacking expedited removal proceedings.

with the R&R that there was no fundamental procedural error in Defendant's removal proceedings that would invalidate the prior order of removal, and furthermore, that Defendant failed to demonstrate prejudice even if a procedural error occurred.

The Immigration and Nationality Act provides: "If an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible . . ., the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). Alternatively, "[a]n alien applying for admission may, *in the discretion of the [Secretary of Homeland Security]* and at any time, be permitted to withdraw the application for admission and depart immediately from the United States." *Id.* § 1225(a)(4) (emphasis added); *see* 8 C.F.R. § 1235.4 ("The [Secretary of Homeland Security] may, in his or her discretion, permit any alien applicant for admission to withdraw his or her application for admission in lieu of removal proceedings . . . or expedited removal[.]").[3]

Regulations and directives guide CBP officers in how their discretion should be exercised. *See* 8 C.F.R. § 1235.4 ("Permission to withdraw an application for admission should not normally be granted unless the alien intends and is able to depart the United States immediately."); CBP Directive No. 3340-043, at ¶ 8.4.5 (Sept. 3, 2008) ("In exercising discretion to permit a withdrawal of application for admission, carefully

---

[3]    When the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, was passed, the Attorney General's authority under § 1225(b) was delegated to the Secretary of DHS.

consider all the facts and circumstances related to the case to determine whether permitting withdrawal would be in the best interest of justice, or conversely, if justice would be ill-served if an order of removal were issued.").  Additionally, the applicable regulations and directives make clear that an alien has no right to withdraw an application, and a CBP agent's decision to allow withdrawal is entirely discretionary.  *See* 8 C.F.R. § 1235.4 ("[N]othing in this section shall be construed as to give an alien the right to withdraw his or her application for admission."); CBP Directive No. 3340-043, at ¶ 8.4.2 ("An alien cannot, as a matter of right, withdraw his or her application for admission, but may be permitted to withdraw if it is determined to be in the best interest of justice that a removal order not be issued."); INS Inspector's Field Manual § 17.2(a) (same); *see also United States v. Meraz-Olivera*, 472 F. App'x 610, 612 (9th Cir. 2012) ("An alien does not have the right to withdraw his application for admission[.]").

With respect to expedited removal orders, the relevant guidance documents provide that "the decision of whether to permit withdrawal should be based on a careful balancing of relevant favorable and unfavorable factors in order to reach an equitable decision."  INS Inspector's Field Manual § 17.2(a) (2007), *available at* Westlaw FIM–INSFMAN 17.2, 2007 WL 7710869.  These factors include but are not limited to:

    (1)    The seriousness of the immigration violation;
    (2)    Previous findings of inadmissibility against the alien;
    (3)    Intent on the part of the alien to violate the law;
    (4)    Ability to easily overcome the ground of inadmissibility (i.e., lack of documents);
    (5)    Age or poor health of the alien; and
    (6)    Other humanitarian or public interest considerations.

*Id.* However, these guidance documents also state that "[a]n expedited removal order should ordinarily be issued, rather than permitting withdrawal, in situations where there is obvious, deliberate fraud on the part of the applicant. For example, where counterfeit or fraudulent documents are involved, an expedited removal order is normally the appropriate response." *Id.*; *see* CBP Directive No. 3340-043, at ¶ 8.4.7 ("Withdrawal of application for admission should not be permitted in situations involving obvious, deliberate fraud on the part of the applicant[.]"). These documents also note that previous "long-term" overstays may merit an expedited removal order as opposed to permitting withdrawal. *See* CBP Directive No. 3340-043, at ¶ 8.4.7; INS Inspector's Field Manual § 17.2(a) ("[I]f the facts of the case indicate particularly egregious immigration violations, such as long-term . . . overstays, . . . or that the alien is again likely to remain beyond his or her authorized stay or otherwise violate his or her status, an expedited removal order may be appropriate.").

Defendant argues that immigration officials violated various regulations and internal guidance with regard to exercising discretion at a port of entry, with respect to minor/technical immigration violations, and concerning the exercise of discretion in the best interest of justice. (Dkt. 49 at 12-17). Defendant also argues that immigration officials improperly completed the Checklist. (*Id*. at 17-21). Each argument is examined below.

### A.   Port of Entry Regulations and Guidance

Defendant argues that because she could have easily departed the United States and walked back to Mexico immediately, "government regulations call for simply denying her entry into the United States, turning her around, and telling her to go back to Mexico." (*Id*.

at 13).  The regulation cited by Defendant is 8 C.F.R. § 235.4, which states: "Permission to withdraw an application for admission should not normally be granted unless the alien intends and is able to depart the United States immediately."  Defendant also points to CBP Directive No. 3340-043, ¶ 8.4.3: "Prior to permitting an alien to withdraw his or her application for admission, the alien must demonstrate both the intent and means to depart immediately from the United States."  However, contrary to Defendant's characterization, while the regulation and CBP directive make an alien's intent and ability to immediately depart the United States *necessary* conditions for granting permission to withdraw, they do automatically require withdrawal of the application for admission simply because an individual has the requisite intent and ability to immediately depart the United States. Indeed, as detailed above, CBP officials are directed to consider numerous other factors when determining whether to allow an individual to withdraw her application.  *See* INS Inspector's Field Manual § 17.2(a).

Defendant also cites to several portions of the CBP Directive that discuss allowing withdrawals of applications when refusing aliens admission at a port of entry.  (Dkt. 49 at 13-14).  The subsections Defendant cites to stand for the proposition that "normally" in port of entry environments, it is "generally reasonable" to accept an application withdrawal.  *See* CBP Directive No. 3340-043, ¶ 6.1.1 ("In these environments, an inadmissible alien can normally be returned to a contiguous country immediately or without the need to arrange for additional transportation or to be taken into federal custody. Ports may need to consider additional factors where refused aliens must be transported to a designated return location."); *id.*, ¶ 6.1.2 ("In these environments, it is generally

reasonable to refuse admission, or accept a withdrawal of application, as it would not create an undue hardship on an alien."). However, Defendant fails to acknowledge the very next subsection, which states: "Despite the ease with which aliens may be refused admission in these environments, CBP supervisors and officers must continue to evaluate each case to adequately determine if the exercise of discretionary authority is warranted." *Id.*, ¶ 6.1.3. In other words, although it may be "generally reasonable" for CBP officers at ports of entry to exercise their discretionary authority to allow an alien to withdraw an admission application, the officers must still evaluate whether that exercise of authority is appropriate on a case-by-case basis. In the instant matter, after the CBP Officer evaluated Defendant's individual circumstances, he determined that she should not be permitted to withdraw her application. These actions do not deviate from the CBP directive, but comply with it.

### B.      Regulations and Guidance on Minor/Technical Immigration Offenses

Defendant also argues that because the CBP officer noted that the nature of Defendant's inadmissibility was "Minor/Technical," he did not comply with the CBP Directive by not allowing Defendant to withdraw her application. (Dkt. 49 at 14-15). However, once again, the provisions in the CBP Directive cited by Defendant do not mandate allowing withdrawal when the immigration violation is noted to be minor or technical in nature. *See* CBP Directive No. 3340-043, ¶ 2.4 ("It is the policy of CBP *to consider* the exercise of discretionary measures in favor of aliens who are inadmissible due to a minor or technical violation of the INA. This includes the use of the waiver and parole processes to allow such aliens into the United States, where appropriate and permissible by law." (emphasis added)); *id.*, ¶ 2.5 ("It is the policy of CBP that in individual cases

involving technical inadmissibility, minor violations, and apparent bona fide travel, where refusal of admission or withdrawal of application for admission would involve detention or undue hardship, it is appropriate *to expansively consider* the exercise of discretionary authority." (emphasis added)).  To the contrary, allowing every applicant with a minor or technical violation to withdraw an application for admission, as Defendant appears to suggest, would directly contradict one of the provisions Defendant cites to—Paragraph 2.5 of the CBP Directive which states that discretionary authority in cases involving technical inadmissibility and minor violations "must be applied on a case-by-case basis and may not be interpreted to provide relief from the visa requirement in any systemic manner to any particular class of aliens."

Defendant argues that the CBP officers "should have known that [Defendant] had a long and extended period[] of legal status in the United States, as well as family with minor children who are citizens."  (Dkt. 49 at 15).  The record before the Court shows that the CBP officer did know that information and noted it on the form.  (Dkt. 19 at 16).  However, the record also shows that the CBP officer had knowledge of Defendant's long and extended period of *illegal* status in the United States, as well as her knowing presentation of a fraudulent visa in an attempt to obtain admission (Dkt. 24 at 3, 9-10), both of which the CBP Directive states are grounds for not permitting withdrawal of an application, CBP Directive No. 3340-043, ¶ 8.4.7 ("Withdrawal of application for admission should not be permitted in situations involving obvious, deliberate fraud on the part of the applicant, or when especially egregious CBP violations are uncovered (e.g., long-term . . . overstays . . .).").  In other words, the record shows that the CBP officer complied with the

CBP Directive's guidance to exercise authority on a case-by-case basis when addressing applications with minor or technical issues.

### C. Regulations and Guidance on the Best Interest of Justice

Defendant argues that the CBP Directive includes multiple provisions stressing "that immigration officers make determinations on a case-by-case basis with the goal of avoiding undue hardship and injustice." (Dkt. 49 at 15-17). As with all of the other regulations and guidance document provisions cited by Defendant, the excerpts Defendant relies on here stand for the proposition that immigration officials must consider a variety of factors on an individual basis when determining whether to exercise discretion to allow withdrawal of an application. *See* Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877, 48878-79 (Aug. 11, 2004) ("[I]n appropriate circumstances and as an exercise of prosecutorial discretion, officers will be able to permit certain aliens described in this notice to return voluntarily, withdraw their application for admission[.]" (emphasis added)); CBP Directive No. 3340-043, ¶ 2.6 ("It is the policy of CBP that supervisors and managers will responsibly assess every case involving a prospective adverse action."); *id.*, ¶ 8.4.2 ("An alien cannot, as a matter of right, withdraw his or her application for admission, but *may* be permitted to withdraw if it is determined to be in the best interest of justice that a removal order not be issued." (emphasis added)); *id.*, ¶ 8.4.5 ("In exercising discretion to permit a withdrawal of application for admission, *carefully consider all the facts and circumstances* related to the case to determine whether permitting withdrawal would be in the best interest of justice[.]" (emphasis added)); *id.*, ¶ 8.4.6 ("[T]he decision

to permit withdrawal should be based on a careful consideration of relevant mitigating and aggravating factors[.]").

The record before the Court shows that the CBP officers involved did consider all of the factors described by Defendant in making their determination of whether withdrawal "would be in the best interest of justice," as well as others that Defendant ignores, including her previous and prolonged illegal residence in the United States and her presentation of fraudulent documents to obtain re-admission. Just because Defendant disagrees with the ultimate decision made by immigration officials does not mean that improper procedures were used to arrive at it. Accordingly, for the reasons stated above, Defendant has failed to demonstrate that immigration officials committed a fundamental procedural error by violating a regulation or administrative directive.

### D.   Checklist

Defendant also objects to the R&R's conclusion that the Checklist filled out by the CBP official was appropriately completed and used. (Dkt. 49 at 12; *see* Dkt. 48 at 8-9). Specifically, Defendant contends that immigration officials "erroneously deemed [Defendant] as a threat claiming that she is likely to add to the illegal population," and improperly weighed the factors in the Checklist. (Dkt. 49 at 19-20). However, Defendant overlooks two critical facts considered by immigration officials: she lived illegally in the United States for over five years and knowingly presented fraudulent documents when attempting to gain admission. As discussed at length above, immigration officials were entitled to consider these factors, *see* CBP Directive No. 3340-043, ¶ 8.4.7 ("Withdrawal of application for admission should not be permitted in situations involving obvious,

deliberate fraud on the part of the applicant, or when especially egregious CBP violations are uncovered (e.g., long-term . . . overstays . . .).”), and the Checklist notes that they did so (Dkt. 19 at 16-18); *see also United States v. Barajas-Alvarado*, 655 F.3d 1077, 1091 (9th Cir. 2011) (finding other considerations in the INS Field Manual carried “little weight” in light of the Manual’s “emphasis on the disqualifying effect of obvious, deliberate fraud on the part of the applicant”).   In other words, Defendant has not shown that the immigration official’s use of the Checklist was a fundamental procedural error; instead, as the R&R found, “[t]he guidance checklist contained accurate information and was used appropriately by U.S. Customs and Border Protection agents.”  (Dkt. 48 at 10).

Accordingly, the Court agrees with the R&R and finds that Defendant has failed to demonstrate a fundamental procedural error so as to satisfy the third requirement of 8 U.S.C. § 1326(d) of establishing fundamental unfairness.

E.   **Prejudice**

The Court further agrees with the R&R’s determination that even if there was some sort of procedural error, Defendant has also failed to demonstrate prejudice.  (*See* Dkt. 48 at 11-12).  “The Second Circuit has explained that the test for prejudice is akin to that used for ineffective assistance of counsel claims, requiring a ‘reasonable probability that, but for [the] . . . errors, the result of the proceeding would have been different.’”  *United States v. Espinoza*, No. 1:19-CR-00641-GHW, 2020 WL 1049143, at *5 (S.D.N.Y. Mar. 4, 2020) (alterations in original) (quoting *United States v. Copeland*, 376 F.3d 61, 73 (2d Cir. 2004)).  “Where the relevant form of relief is discretionary, the alien must make a

'plausible' showing that the facts presented would cause the [immigration official] to exercise discretion in his favor." *Barajas-Alvarado*, 655 F.3d at 1089 (quotation omitted).

Defendant argues that if the Checklist had been properly executed, then "it would have confirmed to immigration officers that they should exercise their discretionary authority and permit [Defendant] to withdraw her application for admission," Defendant would have walked back to Mexico, and she could have obtained a valid visa. (Dkt. 49 at 22). However, as the R&R discussed, "[D]efendant admits that she had been living and working [in] the United States for over ten years without applying for legal residency or citizenship," and her "fraudulent production of documents tips the scale strongly against her claim." (Dkt. 48 at 12); *see Barajas-Alvarado*, 655 F.3d at 1091. In other words, Defendant's circumstances fail to make it plausible that immigration officials would have exercised their discretion to allow her to withdraw her application.

Defendant contends that it was improper for the R&R to place "a great deal of weight" on Defendant's presentation of false papers when attempting to enter the United States in December 2014. (Dkt. 49 at 20-21). Defendant cites no authority in support of this proposition, but instead attempts to distinguish the instant matter from the case primarily relied on by the R&R, *United States v. Raya-Vaca*, 771 F.3d 1195 (9th Cir. 2014).[4] In *Raya-Vaca*, the Ninth Circuit found that the defendant demonstrated plausibility

---

[4]      The Supreme Court in *Thuraissigiam* abrogated the holding in *Raya-Vaca* to the extent it held that the Due Process Clause applies to an alien who had "entered" the United States, even if the entry involved barely crossing the border into the United States. *See Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) (Due Process rights did not apply to alien who succeeded in making it 25 yards into the United States before he was caught). The Court agrees with the Government that *Thuraissigiam*'s abrogation of *Raya-Vaca* on this

of relief in large part because he had *not* committed fraud.  *Id.* at 1207 ("[The defendant] committed no fraud, let alone obvious or deliberate fraud, when entering the United States. Therefore, a crucial consideration that, according to the Inspector's Field Manual, 'ordinarily' militates against withdrawal . . . is absent here.").  Defendant argues that the lack of a false document in *Raya-Vaca* was "not necessarily the reason the Ninth Circuit invalidated that order," and points to the factual background of a different Ninth Circuit case, *Valadez-Munoz v. Holder*, 623 F.3d 1304 (9th Cir. 2010), where the immigration officer did exercise his discretionary authority to allow the alien—who had presented false documents—to withdraw his application.  (Dkt. 49 at 20-21); *see Valadez-Munoz*, 623 F.3d at 1306.

The Court is not persuaded by Defendant's arguments.  Even if the *Raya-Vaca* decision was not made exclusively on the basis that the defendant had not engaged in fraudulent conduct, as discussed above, the absence of fraudulent conduct carried considerable weight in the court's determination.  *See Raya-Vaca*, 771 F.3d at 1207. Indeed, the Ninth Circuit has found that the presentation of fraudulent documents has considerable influence on the decisions of immigration officials to allow withdrawal of an application for admission.  *See Barajas-Alvarado*, 655 F.3d at 1091 ("Although [the defendant] argues that arriving aliens who have used fraudulent documents are generally granted withdrawal, the record does not support this claim.").  Additionally, the case cited by Defendant, *Valdez-Munoz*, does not discuss the propriety of the immigration official's

---

ground does not impact the portion of the decision upon which the R&R relies.  (Dkt. 62 at 3-4).

actions.  *See Barajas-Alvarado*, 655 F.3d at 1091 n.17 (noting that *Valadez-Munoz* did not help the defendant "carry his burden of showing it was plausible he would have been granted relief in his unique circumstances" because it did not "address[] nor explain[] why the alien was granted withdrawal relief").  Moreover, the relevant events in *Valdez-Munoz* took place in 1997, long before the 2008 CBP Directive was issued, which, as discussed above, instructs immigration officials that "[w]ithdrawal of application for admission should not be permitted in situations involving obvious, deliberate fraud on the part of the applicant."  CBP Directive No. 3340-043, ¶ 8.4.7.  In any event, the decision of one immigration official more than 20 years ago to allow an individual to withdraw his application after the presentation of fraudulent documents, as referenced in a decision by court outside this Circuit, does not raise Defendant's claim of prejudice to the realm of plausibility.

Likewise, Defendant's reliance on the unreported report and recommendation in *United States v. Chmielowski*, No. 15-cr-185, Dkt. 31 (W.D.N.Y. May 13, 2016),[5] is misplaced.  In *Chmielowski*, the magistrate judge found the defendant had demonstrated a fundamental procedural error during an exclusion hearing before an immigration judge ("IJ") because the defendant's "counsel was absent and he did not know what was

---

[5] This case was assigned to the undersigned; however, the report and recommendation was never considered or adopted by the district court because, after issuance of the magistrate judge's report and recommendation and on the date objections were due, the Government filed a motion to dismiss the indictment because, at that point, the defendant had been detained longer than the recommended range of incarceration under the Sentencing Guidelines if convicted at trial and the defendant was likely to be deported after any prison sentence.  *See United States v. Chmielowski*, No. 15-cr-185, Dkt. 32 (W.D.N.Y. May 27, 2016).

happening during the proceeding." *Id.* at 23. The court additionally found that the defendant had demonstrated prejudice because an "attorney could have persuaded the IJ that the defendant was not guilty of committing fraud," and that the testimony elicited at the exclusion hearing suggested that the defendant believed his visa was valid. *Id.* at 24. In the instant matter, Defendant contests the discretionary determination of an immigration official whose decision was supported by an agency directive, not a ruling by an IJ to deny legal counsel during a hearing.

Accordingly, Defendant has not met her burden of showing prejudice from any alleged procedural error. For these reasons, and for the reasons set forth in the R&R, Defendant's motion to dismiss the Indictment is denied.

## III.   Motion to Suppress

Defendant argues that during the encounter with Agent Rouch on the train, she was illegally seized and therefore, all evidence that flowed from that encounter must be suppressed. (Dkt. 49 at 24). The R&R rejected this argument, concluding that the encounter between Defendant and Agent Rouch "was consensual and does not implicate Fourth Amendment issues." (Dkt. 48 at 17). The Court agrees that the two-to-three minute encounter between Agent Rouch and Defendant, prior to the time that probable cause arose for Defendant's arrest based upon her admission that she was in the country illegally, did not constitute a seizure for purposes of the Fourth Amendment and, therefore, Agent Rouch did not need reasonable suspicion or probable cause to question Defendant.

As an initial matter, to the extent Defendant argues that Agent Rouch was not credible and this Court should reject his testimony as "inconsistent and contrived" (Dkt. 49

at 36-39), the Court disagrees.  Although the Court's review of the R&R is *de novo*, appropriate deference is due to Judge Roemer's credibility determinations as he conducted the evidentiary hearing and observed firsthand the testimony of Agent Rouch (the only witness to testify).  *See United States v. Raddatz*, 447 U.S. 667, 675-76 (1980) (district court is not required to rehear witness testimony when accepting a magistrate judge's credibility findings); *Cullen v. United States*, 194 F.3d 401, 407 (2d Cir. 1999) (holding that "without an evidentiary hearing, the District Court could not reject the Magistrate Judge's proposed credibility finding"); *United States v. Lawson*, 961 F. Supp. 2d 496, 499 (W.D.N.Y. 2013) ("The Second Circuit has instructed that where a Magistrate Judge conducts an evidentiary hearing and makes credibility findings on disputed issues of fact, the district court will ordinarily accept those credibility findings."); *United States v. Preston*, 635 F. Supp. 2d 267, 269 (W.D.N.Y. 2009) ("The district court, however, may not reject the magistrate judge's credibility findings without conducting an evidentiary hearing at which the district court has the opportunity to observe and evaluate witness credibility in the first instance.").

Judge Roemer found Agent Rouch to be "wholly credible."  (Dkt. 48 at 15).  The undersigned has reviewed the transcript of Agent Rouch's testimony (Dkt. 37) and concludes that it fully supports Judge Roemer's factual and credibility determinations, notwithstanding Defendant's arguments otherwise.  Defendant argues that a "major inconsistency" with Agent Rouch's testimony is the fact that the train records indicate that it arrived at the Depew Amtrak station at 8:54 AM, and that Agent Rouch's interaction with Defendant purportedly occurred one minute later, at 8:55 AM.  (Dkt. 49 at 37).  The

Court disagrees that this alleged discrepancy even comes close to a "major inconsistency." Agent Rouch testified that he believed the "transportation check" occurred at "approximately" 8:55 AM. (Dkt. 37 at 9). This time was consistent with that included on the Record of Deportable/Inadmissible Alien (Government Exhibit 1) that was apparently completed several hours after the arrest (Dkt. 37 at 22). The referenced times do not undermine Agent Rouch's testimony that he boarded the train in a matter of "seconds" (Dkt. 37 at 42) and questioned between four and five individuals before encountering Defendant (Dkt. 37 at 11). Indeed, there is no sworn testimony in the record suggesting otherwise, as Agent Rouch was the only witness who testified at the hearing.

Similarly, the Court disagrees with Defendant's argument that Agent Rouch's testimony about Defendant's alleged confession was "contrived" because he needed his recollection refreshed (Dkt. 49 at 37-39)—indeed, if an individual was contriving testimony, it is more likely that he would not candidly admit that he needed to have his recollection refreshed due to the passage of time since the incident in question.

Based upon the Court's *de novo* review, it is apparent that the record supports Judge Roemer's factual conclusions that Agent Rouch was the only agent present in the dining car when he commenced the transportation checks; he started at the front of the car and moved toward the back, questioning approximately four to five passengers before reaching Defendant; Defendant was seated at a table, and after identifying himself, Agent Rouch asked her citizenship; once Defendant replied that she was a citizen of Mexico, Agent Rouch began conversing in Spanish; he did not raise his voice; Agent Rouch was wearing his uniform (which includes a badge, bulletproof vest, and a belt with handcuffs and a

baton); although armed, Agent Rouch did not display his weapon and he did not have any physical contact with Defendant other than when she handed her passport to him; Agent Rouch stood at the head of the table where Defendant was seated, and he did not block her ability to get out from the seat; Agent Rouch did not handcuff Defendant; the initial encounter lasted two to three minutes; Defendant did not ask whether she was free to leave or whether she had to answer Agent Rouch's questions.  (Dkt. 48 at 13-15).

Based on the case law cited in Judge Roemer's R&R and the thorough analysis contained therein, the Court agrees that under the circumstances, Defendant was not seized and the initial encounter with Agent Rouch was consensual.  As a result, Defendant's arguments that Agent Rouch lacked reasonable suspicion are irrelevant, as that was not the basis for his initial encounter with Defendant.  Similarly, Defendant's arguments as to the unsoundness of the current administration's policy concerning transportation checks does not impact the Court's Fourth Amendment analysis.  Defendant's Fourth Amendment rights were not violated, and accordingly, the motion to suppress is denied.

## CONCLUSION

The Court has conducted a careful review of the Report and Recommendation as well as the filings previously made in the case and the record of the hearing conducted before Judge Roemer.  With respect to those issues specifically raised in the objections filed by Defendant, for the reasons set forth above and for the reasons set forth in Judge Roemer's Report and Recommendation, the Court agrees with Judge Roemer that Defendant's motion to dismiss the Indictment and motion to suppress must be denied.  In addition, for all other issues raised by Defendant's motions filed before Judge Roemer, but

not specifically objected to by Defendant, the Court finds no reason to reject or modify the

Report and Recommendation and therefore the Court accepts and adopts the Report and

Recommendation (Dkt. 48) in its entirety and denies Defendant's motion to dismiss the

Indictment and motion to suppress evidence (Dkt. 17).

A telephone status conference is hereby scheduled for <u>Wednesday, August 5, 2020,</u>

<u>at 1:30 PM</u>.  A separate text order will be entered containing the call-in information.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:  August 3, 2020
          Rochester, New York